1
2
3
4
5

6                UNITED STATES DISTRICT COURT

7                EASTERN DISTRICT OF CALIFORNIA

8

| | |
|---|---|
| 9 HECTOR HERRERA, aka Hector Herrera-Sifuentes, | No.  1:15-cv-01466-SKO  HC |
| 10 | |
| Petitioner, | **ORDER DISMISSING PETITION FOR WRIT OF HABEAS CORPUS** |
| 11 | |
| v. | |
| 12 | |
| A. MATEVOUSIAN, Warden, | |
| 13 | **(Docs. 13 and 16)** |
| Respondent. | |
| 14 | |

15       Petitioner, Hector Herrera, a federal prisoner proceeding with a petition for writ of habeas

16 corpus pursuant to 28 U.S.C. § 2241,[1] asserts a single claim of actual innocence based on

17 *Rosemond v. United States*, 134 S.Ct. 1240 (2014).  Respondent moves to dismiss the petition,

18 arguing that Petitioner failed to demonstrate that 28 U.S.C. § 2255 is ineffective or inadequate to

19 challenge his conviction.  Having reviewed the record as a whole and applicable law, the Court

20 dismisses the petition and denies Petitioner's motion for a stay of proceedings.

21

22 **I.      Factual Background[2]**

23       In June 2006, Ramone Santiago Hernandez, Jr., a drug smuggler from Laredo, Texas, was

24 in the border city of Miguel Aleman, Mexico, attempting to initiate a drug transaction.  While

25 there, Hernandez met Jose Garza-Robles, who introduced him to Eulalio "Lalo" Suarez-Sifuentes.

26

---

[1] Pursuant to 28 U.S.C. § 636(c)(1), both parties consented, in writing, to the jurisdiction of a United States
Magistrate Judge to conduct all further proceedings in this case, including the entry of final judgment.
[2] The factual background is derived from Petitioner's direct appeal of his conviction, *United States v. Garza-Robles*,
627 F.3d 161, 163-65 (5th Cir. 2010).

Hernandez was aware that Garza-Robles and Suarez-Sifuentes were members of the Gulf Cartel, and that Suarez-Sifuentes was a high-ranking member.  Hernandez and Suarez-Sifuentes agreed that Hernandez would market the Gulf Cartel's marijuana to new customers in the United States.

Hernandez arranged for the sale of 650 pounds of marijuana to a Houston customer. Hernandez and Garza-Robles delivered the marijuana together.  Although Hernandez had taken steps to ensure that the customer was trustworthy before agreeing to the deal, the customer absconded with the marijuana without paying.

Suarez-Sifuentes ordered Hernandez and Garza-Robles to travel to Mexico to explain the situation in person.  Frightened, Hernandez unsuccessfully attempted to have Texas state police intercept the vehicle before they reached Mexico.  When the two men stopped in Laredo, Hernandez's father encouraged him to show good faith and speak with Suarez-Sifuentes.

Ten to fifteen men, including Petitioner, who was Suarez-Sifuentes' cousin, were present when Hernandez and Garza-Robles arrived at Suarez-Sifuentes' home in Mexico.  Suarez-Sifuentes, who was armed with a machine gun and hand grenades, told Hernandez that he would have to pay back the $110,500 owed to Suarez-Sifuentes, that he would be held until payment was made, and that Hernandez's family would be killed if he fled.[3]  The guards were instructed to shoot Hernandez if he tried to escape.

Suarez-Sifuentes' men held Hernandez for sixteen days.  Petitioner and Garza-Robles were among his guards.  During the course of his imprisonment, Hernandez was blindfolded, punched and kicked, beaten with guns and two-by-fours, sliced with razors, wrapped in plastic wrap and beaten, had a gun shoved in his mouth, had the sign of the cross made on his skin with a gun, and had guns fired close to his ears.  Because he was blindfolded, Hernandez could not identify which guard(s) committed which assault(s).

---

[3] At trial, a FBI agent testified that the drug cartel typically used kidnapping and threats to collect its debts.

The guards allowed Hernandez to call his father to arrange payment.  Hernandez's father paid $57,500, which was delivered to a guard within the United States without incident.  At some point following the payment, Hernandez's family notified the FBI that Hernandez was being held for ransom in Mexico.

Hernandez's girlfriend was to make the next payment.  Suarez-Sifuentes sent an operative to meet her and bring her to Mexico with the money.  The FBI detained Hernandez's girlfriend and the operative at the border and directed the operative to call Suarez-Sifuentes to advise him that they were being detained and that the FBI knew that Suarez-Sifuentes was holding Hernandez.

After first feigning confusion, Suarez-Sifuentes agreed to allow Hernandez to return to Texas.  Suarez-Sifuentes directed Hernandez to tell the FBI that he had not been kidnapped and warned Hernandez that he would come after him if he did not return with the balance of the money.  The FBI seized Hernandez as he crossed the border, searched him for weapons, and took him to Laredo for debriefing.  Hernandez agreed to work with the FBI.

At the FBI's direction, Hernandez told Suarez-Sifuentes that he would return with the rest of the money.  Suarez-Sifuentes claimed he was in trouble with his superiors, who (1) thought Hernandez had paid the full amount due and (2) were angry with Suarez-Sifuentes for detaining Hernandez without permission.  Suarez-Sifuentes asked Hernandez to return to Mexico to pay the balance due and to explain to cartel superiors that Suarez-Sifuentes had not kidnapped him.  Suarez-Sifuentes sent Petitioner and Garza-Robles to pick Hernandez up in Laredo.  The FBI arrested Petitioner and Garza-Robles when they reached Texas.

## II.     **Procedural Background**

Petitioner was charged in two counts of a three-count superseding indictment.  Count one charged Petitioner and Garza-Robles with conspiring to kidnap a victim in foreign commerce (18

3

1   U.S.C. § 1201).  They were charged in count two with aiding and abetting the kidnapping (18

2   U.S.C. §§ 2 and 1201).  Following conviction on both counts, the United States District Court for

3   the Southern District of Texas sentenced Petitioner to life imprisonment.

4       Petitioner and his co-defendant appealed their convictions to the U.S. Court of Appeals for

5   the Fifth Circuit, which affirmed their convictions and the sentence enhancement.  *Garza-Robles*,

6   627 F.3d 1611.  The U.S. Supreme Court denied Petitioner's petition for writ of certiorari on June

7   6, 2011.  *Herrera-Sifuentes v. United States*, 131 S.Ct. 2978 (2011).

8

9       On May 22, 2012, Petitioner sought post-conviction relief pursuant to 28 U.S.C. § 2255,

10  claiming ineffective assistance of counsel, *Brady* violations, lack of jurisdiction, and erroneous

11  jury instructions.  The District Court denied relief.  *Herrera-Sifuentes v. United States*, 2014 WL

12  2718671 (S.D.Tex. June 13, 2014) (No. 5:12-cv-82).

13

14      On September 28, 2015, in the Eastern District of California, Petitioner filed the above-

15  captioned petition for writ of habeas corpus pursuant to § 2241.  Respondent moved to dismiss on

16  December 17, 2015.

17      On January 5, 2016, Petitioner moved in the Fifth Circuit for authorization to file a

18  successive § 2255 petition setting forth the same claims as those set forth in the above-captioned

19  habeas petition.  On January 28, 2016, Petitioner moved for a stay of proceedings to permit him

20  to secure further evidence of his innocence.  On February 2, 2016, the Fifth Circuit denied the

21  motion to stay proceedings.  On February 24, 2016, the court denied authorization to file a second

22  or successive petition.  The Fifth Circuit stated, in pertinent part:

23

24

25          Herrera-Sifuentes seeks to raise a claim of actual innocence based
            on newly discovered evidence and also argues that the claim is
26          based on a new rule of law as announced in *Rosemond v. United
            States*, 134 S.Ct. 1240 (2014).  The alleged newly discovered
27          evidence are e-mails written in Spanish "from an intimate
            acquaintance" of Hernandez, the person who was kidnapped.
28          Herrera-Sifuentes asserts that the emails show that Hernandez
            fabricated the evidence against him.

                                                4

1
2
3
4
5
6
7
8

Herrera-Sifuentes has not presented any evidence that these emails "if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense." § 2255(h)(1). Additionally, the emails do not demonstrate that "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *McQuiggin v. Perkins*, 133 S.Ct. 1924, 1928 (2013) (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). Further, *Rosemond* is not a basis for this court to authorize the filing of a successive § 2255 motion because the holding involved an issue of statutory interpretation rather than a new rule of constitutional law, and there is no indication that the Supreme Court intended the decision to apply retroactively in cases on collateral review. *See Rosemond*, 134 S.Ct. at 1243-52.

9
10
11
12

Because he fails to show that his proposed claim is based on either newly discovered evidence that would clearly establish that no reasonable factfinder would have found him guilty or a new rule of constitutional law made retroactive to cases on collateral review by the Supreme Court that was not previously available, Herrera-Sifuentes has not made the showing necessary to file a successive § 2255 motion. *See* § 2255(h); *Reyes-Requena v. United States*, 243 F.3d 893, 897-978 (5th Cir. 2001).

13
14

*In re Herrera-Sifuentes*, Doc. 00513394217 (5th Cir. Feb. 24, 2016) (No. 16-40014).

15

## III.   Using § 2241 to Challenge the Validity of a Conviction

16

### A.   Jurisdiction

17
18
19

A federal court may not consider an action over which it has no jurisdiction. *Hernandez v. Campbell*, 204 F.3d 861, 865 (9th Cir. 2000). Respondent contends that because Petitioner cannot prove the elements necessary to bring an action challenging his conviction under § 2241, the District Court has no jurisdiction over the petition and must dismiss it.

20
21
22
23
24
25

A federal prisoner who wishes to challenge the validity or constitutionality of his conviction or sentence must do so by filing a motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255. *Tripati v. Henman*, 843 F.2d 1160, 1162 (9th Cir. 1988). Only the sentencing court has jurisdiction to entertain a § 2255 motion. *Id.* at 1163. As detailed above, in 2012, Petitioner unsuccessfully sought § 2255 relief in the Southern District of Texas, the court in which he was convicted and sentenced. Later, during the pendency of this action, Petitioner

26

///

27

///

28

5

1    unsuccessfully petitioned the Fifth Circuit Court of Appeal for leave to file a second or successive

2    2255 action on the same claims set forth in the § 2241 petition now before this Court.[4]

3          "The general rule is that a motion under 28 U.S.C. § 2255 is the exclusive means by

4    which a federal prisoner may test the legality of his detention and that restrictions on the

5    availability of a § 2255 motion cannot be avoided through a petition under 28 U.S.C. § 2241."

6    *Stephens*, 464 F.3d at 897 (citation omitted).  An exception to the rule, commonly referred to as

7    the "escape hatch" or the "savings clause," "permits a federal prisoner to file a habeas corpus

8    petition pursuant to § 2241 to contest the legality of a sentence where his remedy under § 2255 is

9    inadequate or ineffective to test the legality of his detention." *Id.* (citations and internal

10   quotations omitted).  *See also Marrero v. Ives*, 682 F.3d 1190, 1192 (9th Cir. 2012) ("Under the

11   escape hatch of § 2255, a federal prisoner may file a § 2241 petition if, and only if, the remedy

12   under § 2255 is inadequate or ineffective to test the legality of his detention.")  To qualify for the

13   escape hatch, a prisoner must demonstrate (1)  a claim of actual innocence and (2) the absence of

14   an unobstructed procedural shot at presenting his claim.  *Id.*  When a prisoner seeks to challenge

15   his conviction in light of  a post-conviction change in applicable federal law, as set forth in a

16   holding in a case decided by the Supreme Court, he must bring his claim in a § 2255 action unless

17   he satisfies the criteria for the escape hatch.  *Harrison v. Ollison*, 519 F.3d 952, 956 (9th Cir.

18   2008).  The prisoner carries the burden of proving that the remedy available under § 2255 is

19   inadequate of ineffective.  *Redfield v. United States*, 315 F.2d 76, 83 (9th Cir. 1963).

20         **B.**    <u>**Unobstructed Procedural Shot**</u>

21         "In determining whether a petitioner had an unobstructed procedural shot to pursue his

22   claim, we ask whether petitioner's claim 'did not become available' until after a federal court

23   decision." *Harrison*, 519 F.3d at 960 (quoting *Stephens*, 464 F.3d at 898).  To do this, a court

24   must consider "(1) whether the legal basis for petitioner's claim 'did not arise until after he had

25

26   [4] When a petitioner seeks authorization to bring a second or successive § 2255 petition based on a change in applicable law, "a court of appeals may authorize a second or successive § 2255 motion only if the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was

27   previously unavailable." *Stephens v. Herrera*, 464 F.3d 895, 897 (9th Cir. 2006).  Concluding that the *Rosemond* decision did not announce a new rule of constitutional law that was applicable retroactively to cases on collateral

28   review, the Fifth Circuit denied Petitioner authorization to file a second or successive § 2255 petition.

exhausted his direct appeal and first § 2255 motion;' and (2) whether the law changed "in any way relevant" to petitioner's claim after that first § 2255 motion." *Harrison*, 519 F.3d at 960 (quoting *Ivy v. Pontesso*, 328 F.3d 1057, 1060-61 (9th Cir. 2003)).

"An intervening court decision must 'effect a material change in the application of applicable law' to establish unavailability.'" *Alaimalo v. United States*, 645 F.3d 1042, 1047 (9th Cir. 2011) (quoting *Harrison*, 519 F.3d at 960). "[A] decision that simply 'provides further clarification' of the statute of conviction without 'materially vary[ing ] from the statutory construction set forth' in previous case law does not effect such a change." *Alaimalo*, 645 F.3d at 1048 (quoting *Harrison*, 519 F.3d at 960). Petitioner contends that the *Rosemond* decision gave rise to a legal basis that he had not previously been able to pursue -- a requirement that the government prove every element of the specific crimes charged.

### 1.   *Rosemond* and an Intent to Commit All Charged Offenses

A person who directly "commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission is punishable as a principal." 18 U.S.C. § 2(a). Petitioner argues that *Rosemond* reinterpreted § 2(a) to require the government to "establish an intent that goes to the specific and entire crime charged." *Rosemond*, 134 S.Ct. at 1248. He contends that after *Rosemond*, the prosecutor had to prove that Petitioner had advance knowledge that his co-defendant was going to kidnap Hernandez and sufficient time to make the legal and moral choice to walk away from the crime. In making this argument, Petitioner omits a critical element of the *Rosemond* holding: multiple elements for which intent must be proven. As a result, even if *Rosemond* could be applied retroactively, Petitioner cannot prevail.

*Rosemond* also addressed a drug deal gone bad. 134 S.Ct. at 1243. Vashti Perez drove to a local park to sell a pound of marijuana. *Id.* Justus Rosemond and Ronald Joseph accompanied her. *Id.* One man sat in the front passenger seat and one sat on the back seat, but witnesses disputed which man sat in which position. *Id.* After inspecting the marijuana in the back seat, the putative purchaser punched the man seated in the back and fled with the marijuana without paying. *Id.* One of the men jumped from the vehicle, fired multiple shots from a semiautomatic handgun, and then got back in the car before Ms. Perez gave chase. *Id.* Witnesses disputed

1  which man was the shooter.  *Id.*  Rosemond maintained that he was unarmed and had no

2  knowledge that Painter had a gun.  *Id.* at 1245-46.  He argued that he could not be convicted of

3  aiding and abetting the gun offense since he had agreed only to participate in the drug sale and

4  had no intent to use a firearm in the transaction.  *Id.* at 1246.

5      "'A defendant can be convicted as an aider and abettor without proof that he participated

6  in each and every element of the offense.'"  *Rosemond*, 134 S.Ct. at 1246 (quoting *United States*

7  *v. Sigalow*, 812 F.2d 783, 785 (2d Cir. 1987)).  "The division of labor between two or more

8  confederates has no significance: A strategy of 'you take that element, I'll take this one' would

9  free neither party from liability."  *Rosemond*, 134 S.Ct. at 1247.

10      This traditional analysis of aiding and abetting assumes that the defendant proceeded in

11  the criminal "venture with full knowledge of the circumstances constituting the charged offense."

12  *Id.* at 1249-50.  For example, an "unarmed driver of a getaway car ha[s] the requisite intent to aid

13  and abet armed bank robbery if he 'knew' that his confederates would use weapons in carrying

14  out the crime."  *See id.* at 1250 (setting forth multiple cases illustrating this principle).  The Court

15  held that the same principle applied to Rosemond's case: "An active participant in a drug

16  transaction has the intent needed to aid and abet a § 924 violation when he knows that one of his

17  confederates will carry a gun."  *Id.*

18      That "[t]he government must establish an intent that goes to the specific and entire crime

19  charged"  (*Rosemond*, 134 S.Ct. at 1248), is only a part of the Court's explanation of how to

20  consider whether a defendant has aided or abetted a crime, in violation of 18 U.S.C. § 2, when

21  two separate offenses are charged:

22          [A]n aiding and abetting conviction requires not just an act of
            facilitating one or another element, but also *a state of mind*
23          *extending to the entire crime*.  And under that rule, a defendant may
            be convicted of aiding and abetting a § 924(c) violation only if his
24          intent reaches beyond a simple drug sale, to an armed one.  [The
            a]iding and abetting law's intent component—to which we now
25          turn—thus preserves the distinction between assisting the predicate
            drug trafficking crime and assisting the broader § 924(c) offense.
26
27          *Rosemond*, 134 S.Ct. at 1248 (emphasis added).

28  ///

8

The Court emphasized its intent that when a defendant is aware that his confederates will be armed during a drug transaction or a violent crime, traditional principles of accomplice liability will apply:

> An active participant in a drug transaction has the intent needed to aid and abet a § 924(c) violation when he knows one of his confederates will carry a gun.  In such a case, the accomplice has decided to join in the criminal venture, and share in its benefits, with full awareness of its scope—that the plan calls not just for a drug sale, but for an armed one.  In doing so, he has chosen . . . to align himself with the illegal scheme in its entirety—including its use of a firearm.  And he has determined . . . to do what he can to "make [that scheme] succeed."  *Nye & Nissen* [*v. United States*, 336 U.S. 613, 619 (1949)].  He thus becomes responsible, in the typical way of aiders and abettors, for the conduct of others.  He may not have brought the gun to the drug deal himself, but because he took part in that deal knowing a confederate would do so, he intended the commission of a § 924(c) offense—i.e., an armed drug sale.

*Rosemond*, 134 S.Ct. at 1249.

Unlike *Rosemond*, this case presents no possibility of differing intents.  Petitioner was convicted of participating in the conspiracy to kidnap Gonzalez and aiding and abetting the actual kidnapping.  No need to prove intent to commit any separate offense is apparent to the Court, and Petitioner does not articulate any specific additional offense.  As a result, the *Rosemond* decision neither gave rise to a legal basis for Petitioner's claim nor changed the law in a way that was relevant to Petitioner's claim.

## 2.   Sufficiency of Evidence

To establish actual innocence, Petitioner submitted two emails, each two paragraphs long and in their original Spanish, as exhibits to the petition in this case.  Respondent provided English translations as Docs. 13-7 and 13-8.  Both emails were sent to "64739179," which is Petitioner's prison identification number.  Dated February 17, 2012, and February 18, 2012, Petitioner received both emails before filing his first § 2255 petition on May 12, 2012.  Thus, Petitioner would have had an unobstructed procedural shot to present the emails as part of his claims in his original § 2255 petition.

In any event, Petitioner does not argue that he lacked intent to commit both crimes.  Instead, he argues that the evidence against him was not sufficient to prove that he participated in

1   the kidnapping or that he "had more than adequate knowledge and time to walk away from the

2   kidnapping conspiracy."  Doc. 1 at 19.  Petitioner cannot demonstrate that he has never had an

3   unobstructed procedural shot at presenting an insufficient evidence claim.

4         The Fifth Circuit addressed the sufficiency of evidence to convict Petitioner in Petitioner's

5   direct appeal.  *Garza-Robles*, 627 F.3d at 166-69.  Applying the standard articulated in *United*

6   *States v. Ferguson*, 211 F.3d 878, 882 (5th Cir. 2000), the Fifth Circuit concluded that Petitioner

7   knew of the conspiracy and acted in furtherance of the conspiracy when he guarded Hernandez

8   during his confinement in Mexico.  627 F.3d at 169.  His participation in the cartel continued

9   when he travelled to Texas with Garza-Robles to "accompany" Hernandez to Mexico after his

10  release.

11        **C.**    **<u>Actual Innocence</u>**

12        "To establish actual innocence for the purposes of habeas relief, a petitioner must

13  demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror

14  would have convicted him."  *Alaimalo*, 645 F.3d at 1047 (citations and internal quotations

15  omitted).  "A petitioner is actually innocent when he was convicted for conduct not prohibited by

16  law."  *Id.*  Since Petitioner cannot establish the first criteria to qualify for the escape hatch, the

17  Court need not reach the question of whether no reasonable juror would have convicted Petitioner

18  if he or she had seen the new evidence, as set forth in the e-mails first presented in the § 2241

19  petition.  Even if Petitioner had established that he had not had an unobstructed procedural shot to

20  pursue his claims, however, he could not prove actual innocence.

21        Petitioner was convicted of aiding and abetting kidnapping in violation of 18 U.S.C.

22  § 1201(a)(1), which required the government to prove "'(1) the transportation in interstate or

23  foreign commerce, (2) of an unconsenting person who is (3) held for ransom or reward or

24  otherwise, (4) such acts being done knowingly and willfully.'"  *Garza-Robles*, 627 F.3d at 166

25  (quoting *United States v. Barton*, 257 F.3d 433, 439 (5th Cir. 2001)).  The only element that the

26  defendants disputed at Petitioner's trial was Hernandez's consent.  *Id.*  Although the Fifth Circuit

27  rejected the government's theory that Hernandez was inveigled into Mexico,[5] it concluded that

28               
[5] "The failure to release the victim within twenty-four hours after he shall have been unlawfully seized, confined,

10

the evidence at trial was sufficient to prove that Petitioner and his confederates kidnapped

Hernandez in violation of § 1201(a):

> It was not necessary that Hernandez be "physically restrained or confined," as non-physical restraint arising from fear is enough to support a kidnapping conviction. [*United States v. Carrion-Caliz*, 944 F.2d 220, 225 (5th Cir. 2001).] Being restrained against one's will is the key. *Id.* A person's will can be overcome physically or by mental inducements such as threats. *Chatwin v. United States*, 326 U.S. 455, 460 . . . (1946). Hernandez's being sufficiently frightened to travel to Mexico against his will supports a jury finding that he was seized or confined. A jury instruction explained that to kidnap meant to "hold, keep, detain, and confine the person against that person's will. Involuntariness or coercion in connection with detention" were part of the offense.
>
> From the beginning, Hernandez told Garza-Robles he was scared to accompany him to Mexico. Hernandez insisted that Garza-Robles drive to Mexico because Hernandez was too nervous to drive. Hernandez testified that he had no choice but to meet [Suarez-Sifuentes] because "if you don't show your face, they're going to come and kill your family. That's the way they work." On the way to Mexico, Hernandez called the Texas state police in an attempt to be arrested. Hernandez testified that he "was kind of being forced to go [to] Mexico, that he didn't want to go because [he] was scared [he] was not going to come back." The attempt to be apprehended was unsuccessful. When questioned why he did not just get out of the truck and run, Hernandez responded, "I was scared."
>
> Prior to crossing the border, the pair stopped in Laredo, and Hernandez again told Garza-Robles that he did not want to go see [Suarez-Sifuentes]. Garza-Robles insisted that Hernandez had to explain in person what happened with the lost drugs.
>
> When Garza-Robles and Hernandez reached the border, Hernandez did not inform the border agent of his predicament. Hernandez explained, "You know, I wanted to get out . . . at that time; I mean, I didn't want to cross to Miguel Aleman, but I was scared about everything, that they were going to come and get my family."
>
> *Garza-Robles*, 627 F.3d at 167-68.

The Court agrees with the Fifth Circuit that " the emails do not demonstrate that 'no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *Herrera-Sifuentes*, Doc. 00513394217 at 1-2 (quoting *McQuiggin v. Perkins*, 133 S.Ct. 1924, 1928 (2013)).

///

---

inveigled, decoyed, kidnapped, abducted or carried away shall create a rebuttable presumption that such person has been transported in interstate or foreign commerce." 18 U.S.C. § 1201(b).

1   Petitioner contends that the emails prove he is innocent and Gonzalez lied about his

2   involvement in the kidnapping for revenge.  The identity of the emails' author, Lesbia Gonzalez,

3   is not clear from the record.  The content indicates that the author is acquainted with Petitioner,

4   Petitioner's mother and attorney, and various of the participants in the underlying drug

5   trafficking, including Gonzalez and Suarez-Sifuentes.  The author claims that "Ramon" had sent

6   her a tape recording in which he and Suarez-Sifuentes discussed what happened to Ramon

7   "before they let him go."  She wrote,"[H]e sent it to us so that we would give it to my brother

8   in law so that he could harm [Suarez-Sifuentes], since my friend's brother in law was his boss."  She

9   added, "We begged with him, to open the case, that you were innocent and said that he only did it

10  to ruin [Suarez-Sifuentes]."  In the second email, the author responds that she is willing to help

11  Petitioner in any way in court and offers to email Petitioner the tape recordings from Suarez-

12  Sifuentes and Ramon, indicating Petitioner's  lack of involvement and Ramon's desire to take

13  revenge on Suarez-Sifuentes through Petitioner.

14   Claims of actual innocence "require[] [a] petitioner to support his allegations of

15  constitutional error with reliable new evidence—whether it be exculpatory scientific evidence,

16  trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial."

17  *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Because of the absence of cross-examination or other

18  means of testing credibility, postconviction affidavits are disfavored as evidence of actual

19  innocence.  *Herrera v. Collins*, 506 U.S. 390, 417 (1993).  Unsworn, hearsay statements have

20  even less value.  *Id.*  As in *Herrera*, the statements in this case, the emails, were only made after

21  Petitioner's conviction.  The emails are vague and ambiguous, and Petitioner failed to offer them

22  as evidence in the § 2255 action made shortly after he received them.

23   "To establish actual innocence, petitioner must demonstrate that, in light of all the

24  evidence, it is more likely than not that no reasonable juror would have convicted him."  *Bousley

25  v. United States*, 523 U.S. 614, 623 (1998).  This standard requires the Court to consider not just

26  the affidavits but the extensive physical and testamentary evidence previously held to be

27  sufficient to convict Petitioner for his part in kidnapping Hernandez.  The emails are insufficient

28  ///

12

1    to persuade the Court that a reasonable jury would have acquitted Petitioner if they had been

2    presented at his trial.

3    **IV.    Motion for Stay**

4    Petitioner also moves for a stay of proceedings to permit him to secure evidence to prove

5    his actual innocence.  Because the Court lacks jurisdiction over the petition, it must deny the

6    motion for stay.

7    **V.    Certificate of Appealability**

8    A petitioner seeking a writ of habeas corpus has no absolute entitlement to appeal a

9    district court's denial of his petition, but may only appeal in certain circumstances.  *Miller-El v.*

10   *Cockrell*, 537 U.S. 322, 335-36 (2003).  The controlling statute in determining whether to issue a

11   certificate of appealability is 28 U.S.C. § 2253, which provides:

12
13        (a) In a habeas corpus proceeding or a proceeding under section
          2255 before a district judge, the final order shall be subject to
          review, on appeal, by the court of appeals for the circuit in which
14        the proceeding is held.

15        (b)   There shall be no right of appeal from a final order in a
          proceeding to test the validity of a warrant to remove to another
          district or place for commitment or trial a person charged with a
16        criminal offense against the United States, or to test the validity of
          such person's detention pending removal proceedings.
17

18        (c) (1) Unless a circuit justice or judge issues a certificate of
          appealability, an appeal may not be taken to the court of appeals
19        from—

20            (A)  the final order in a habeas corpus proceeding in which the
          detention complained of arises out of process issued by a State
21        court; or

22            (B)  the final order in a proceeding under section 2255.

23            (2)  A certificate of appealability may issue under paragraph
          (1) only if the applicant has made a substantial showing of the
24        denial of a constitutional right.

25
              (3)  The certificate of appealability under paragraph (1) shall
26        indicate which specific issues or issues satisfy the showing required
          by paragraph (2).
27

28   ///

If a court denies a habeas petition, the court may only issue a certificate of appealability when the prisoner shows "that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation omitted). Although the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his  . . .  part." *Miller-El*, 537 U.S. at 338.

In the present case, the Court finds that reasonable jurists would not find the Court's determination that it lacks jurisdiction over Petitioner's § 2241 petition to be debatable or wrong. Accordingly, the Court declines to issue a certificate of appealability.

**V.** **Conclusion and Order**

Because Petitioner cannot establish either element of the "escape hatch" or the "savings clause," this Court lacks jurisdiction to consider his petition for writ of habeas corpus under 28 U.S.C. § 2241. Accordingly, the Court hereby ORDERS:

1. The petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 is DISMISSED for lack of jurisdiction;

2. Petitioner's motion for a stay of proceedings is DENIED;

3. The Court DECLINES to issue a certificate of appealabilty; and

4. The Clerk of Court is DIRECTED to enter judgment for Respondent.

IT IS SO ORDERED.

Dated:   **April 18, 2016**                              **/s/ Sheila K. Oberto**
                                                                    UNITED STATES MAGISTRATE JUDGE